**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **MICROSTRATEGY SERVICES** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:14-cv-01244** |
| | ) | |
| **OPENRISK, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF OPENRISK, LLC'S**
**AMENDED ANSWER ALLEGING COUNTERCLAIMS**

Defendant/Counterclaim Plaintiff OpenRisk, LLC (the "Company" or "OpenRisk"), through its attorneys, answers and alleges the following defenses and counterclaims against Plaintiff/Counterclaim Defendant MicroStrategy Services Corporation ("MicroStrategy").

## ANSWER

Defendant OpenRisk, LLC ("OpenRisk") through its undersigned counsel, responds to the Complaint of MicroStrategy Services Corporation ("Plaintiff" or "MicroStrategy"), as follows:

1.      OpenRisk states that the two documents attached to the Complaint as Exhibits A and B speak for themselves, admits that the Complaint purports to allege a claim for breach of contract, and otherwise denies the allegations of paragraph 1 of the Complaint.

2.      OpenRisk is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint.

3.      OpenRisk admits that OpenRisk is a Delaware limited liability company founded in January 2011 in part for the reasons set forth in paragraph 3 of the Complaint, states that it has

a principal place of business at 12 Waltham Street, Lexington, Middlesex County,

Massachusetts, and otherwise denies the allegations of paragraph 3 of the Complaint.

4.      OpenRisk admits the allegations in paragraph 4 of the Complaint.

5.      OpenRisk denies the allegations of paragraph 5 of the Complaint.  This Court

lacks subject matter jurisdiction because the amount in controversy is less than the amount

required for diversity jurisdiction.

6.      OpenRisk states that the Subscription Agreement speaks for itself and therefore

no response to the allegations in paragraph 6 of the Complaint is required.

7.      OpenRisk states that the Subscription Agreement speaks for itself and therefore

no response to the allegations in paragraph 7 of the Complaint is required.

8.      OpenRisk admits that in September 2011, MicroStrategy and OpenRisk entered

into the Subscription Agreement and further states that the Subscription Agreement and Order

Form speak for themselves and therefore no response to the remaining allegations in paragraph 8

of the Complaint is required.

9.      OpenRisk admits the allegations of paragraph 9 of the Complaint.

10.      OpenRisk is without knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 10 of the Complaint.

11.      OpenRisk admits the allegations of paragraph 11 of the Complaint.

12.      OpenRisk states that the Subscription Agreement speaks for itself and therefore

no response to the allegations in paragraph 12 of the Complaint is required.

13.      OpenRisk states that the Subscription Agreement and Order Form speak for

themselves, and otherwise denies the allegations in paragraph 13 of the Complaint.

14.     OpenRisk states that the Order Form speaks for itself and therefore no response to the allegations in paragraph 14 of the Complaint is required.

15.     OpenRisk states that the Subscription Agreement and Order Form speak for themselves and otherwise denies the allegations in paragraph 15 of the Complaint.

16.     OpenRisk states that the Subscription Agreement and Order Form speak for themselves and otherwise denies the allegations in paragraph 16 of the Complaint.

17.     OpenRisk states that the Subscription Agreement speaks for itself and therefore no response to the allegations in paragraph 17 of the Complaint is required.

18.     OpenRisk is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 18 of the Complaint.

19.     OpenRisk states that the email speaks for itself and therefore no response to the allegations in paragraph 19 of the Complaint is required.

20.     OpenRisk states that the email speaks for itself and therefore no response to the allegations in paragraph 20 of the Complaint is required.

21.     OpenRisk denies the allegations in paragraph 21 of the Complaint.

22.     OpenRisk admits that MicroStrategy sent to OpenRisk the document attached to the Complaint as Exhibit C, but is without knowledge or information to form a belief as to when MicroStrategy sent the document.  Further, OpenRisk states that Exhibit C speaks for itself and therefore no response to the remaining allegations in paragraph 22 is required.

23.     OpenRisk states that paragraph 23 states a legal conclusion to which no response is required.  To the extent a response is required, OpenRisk admits that it did not make the payment by February 20, 2012 and denies that such payment or any other quarterly payments were owed to MicroStrategy.

24.     OpenRisk admits that OpenRisk indicated in November 2011 that it would not be able to continue as a going concern.  Further, the remaining allegations in paragraph 24 state a legal conclusion to which no response is required.

25.     OpenRisk incorporates its response to paragraphs 1 through 24 of the Complaint.

26.     OpenRisk states that paragraph 26 states a legal conclusion to which no response is required.  To the extent a response is required, OpenRisk denies the allegations of paragraph 26 of the Complaint.

27.     OpenRisk denies the allegations in paragraph 27 of the Complaint.

28.     OpenRisk states that paragraph 28 states a legal conclusion to which no response is required.  To the extent a response is required, OpenRisk denies the allegations of paragraph 28 of the Complaint.

29.     OpenRisk denies the allegations in paragraph 29 of the Complaint.

30.     OpenRisk denies the allegations in paragraph 30 of the Complaint.

OpenRisk denies that MicroStrategy is entitled to any of the relief sought in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

OpenRisk states the following Affirmative Defenses to MicroStrategy's Complaint:

1.     The Court lacks subject matter jurisdiction over this action because the amount in controversy is less than the amount required for diversity jurisdiction.

2.     MicroStrategy fails to state a claim upon which relief can be granted against OpenRisk as a matter of fact and/or law.

3.      MicroStrategy's claim against OpenRisk is barred because MicroStrategy committed a material breach of the contract prior to OpenRisk committing the alleged breaches of the contract set forth in the Complaint, and the contract is therefore unenforceable.

4.      MicroStrategy's claim against OpenRisk is barred because MicroStrategy's reading of the contract would be unconscionable.

5.      MicroStrategy's claim against OpenRisk is barred due to the doctrine of estoppel.

6.      MicroStrategy's claim against OpenRisk is barred due to waiver.

7.      MicroStrategy's claim against OpenRisk is barred by the doctrine of unclean hands.

8.      MicroStrategy's claim against OpenRisk is barred because MicroStrategy's conduct made it impossible for OpenRisk to perform its duties under the contract.

9.      MicroStrategy's claim against OpenRisk is barred by the doctrine of frustration of purpose.

10.     MicroStrategy's claim against OpenRisk is barred because MicroStrategy's reading of the contract would render it void and unenforceable due to a lack of consideration.

11.     MicroStrategy's claim against OpenRisk is barred because the damages claimed by MicroStrategy would be an unenforceable penalty.

12.     MicroStrategy has not been damaged in either the manner or to the extent alleged.

13.     OpenRisk reserves the right to rely upon any additional defense that becomes apparent through discovery or the evidence at trial.

## COUNTERCLAIMS

### INTRODUCTION

1.      Founded in January 2011, OpenRisk was a promising start-up company

developing a software platform to be used by insurance and reinsurance companies to estimate damage to real property portfolios caused by hurricanes, floods, earthquakes and other natural disasters (the "Platform").  The key innovation of the OpenRisk Platform was making these catastrophe models and other related hosted data available to its customers via an internet-based "private cloud" – enabling for the first time web-based access to catastrophe models using a common interface, while ensuring data security and unprecedented speed.  The principal value proposition of the OpenRisk Platform was eliminating or reducing customers' need to maintain their own massive hardware systems, high end modeling specialists and technological support – promising major cost savings.

2.      Leaders in the technology and insurance industries and major investors took notice of OpenRisk.

3.      In June 2011, OpenRisk continued to develop its Platform, including through an agreement it had with Netezza/IBM whereby Netezza/IBM made an in-kind contribution to OpenRisk of software development worth approximately $1 million.

4.      By September 2011, IBM had awarded OpenRisk its Top Analytic Inventor Award; OpenRisk had a sales pipeline of more than $9 million in prospective contracts; OpenRisk was in contract negotiations with AIG/Chartis Insurance for a joint product development project, and billion-dollar global reinsurance intermediary Guy Carpenter & Company, LLC had expressed interest in being OpenRisk's exclusive customer among reinsurers.

5.      Also by September 2011, the OpenRisk Platform was sufficiently developed to put on a cloud environment.  This was a necessary next step towards bringing its product to market.  MicroStrategy, a technology company in Northern Virginia, had just begun to provide

cloud services and was in search of customers for its new services.  OpenRisk – with its promising product in development and many interested investors and prospective customers – was exactly the kind of customer that MicroStrategy wanted.

6.      At the end of September 2011, after several meetings between OpenRisk and MicroStrategy – including a dinner meeting in New York with MicroStrategy's CEO Michael Saylor and OpenRisk's CEO James Aylward – OpenRisk and MicroStrategy entered into a contract under which, in exchange for fees, MicroStrategy would provide two terabytes of data storage for the OpenRisk Platform (the "Contract") and set up a cloud environment for OpenRisk pursuant to the parameters set forth in confidential, proprietary OpenRisk software architecture which was shared with MicroStrategy by OpenRisk.  The Contract had a term of five years but permitted MicroStrategy to terminate the Contract for OpenRisk's failure to pay fees.

7.      MicroStrategy viewed the Contract as "a great win":  its "first cloud transaction in the Northeast Region/New York Metro with substantial growth potential."  MicroStrategy awarded the account manager on the Contract, Jordan Christopher, an advance commission of $60,000.  MicroStrategy could claw back Mr. Christopher's commission if the Contract and its revenues stopped.  Thus, MicroStrategy incentivized Mr. Christopher to hold onto the Contract and its revenues.

8.      Meanwhile, in August 2011, OpenRisk was introduced to Marc Roston, a principal with the investment capital firm MNR Capital, LLC ("MNR Capital"), as a possible investor.  Mr. Roston offered $200,000 for a controlling interest in OpenRisk.  Because this implied an enterprise valuation of merely $400,000 and the actual valuation was many times that, OpenRisk refused Mr. Roston's offer.

9.      Mr. Roston would not take no for an answer.  If he could not have a controlling interest in OpenRisk, he still wanted to have a controlling interest in its valuable intellectual property and promising business prospects so that he could profit from them.   Unbeknownst to OpenRisk, Mr. Roston resorted to unlawful means to get what he wanted.  He secretly sought out key officers and employees of OpenRisk – including OpenRisk's President, its Chief Technology Officer and Executive Vice President, and its Chief Scientist and Senior Vice President (collectively, the "Former Employees") – and conspired with them so that they would leave OpenRisk together in order to force OpenRisk's founders to accept Mr. Roston's offer.  When that did not work, Mr. Roston and the Former Employees conspired to steal OpenRisk's confidential intellectual property and confidential and proprietary business information, along with its business prospects.  Mr. Roston and others formed a new company called Spectant Group, LLC ("Spectant") for this purpose.

10.      MicroStrategy joined the conspiracy to steal OpenRisk's confidential intellectual property and confidential and proprietary business information, along with its business prospects.   MicroStrategy facilitated the co-conspirators' theft of OpenRisk's confidential intellectual property and confidential and proprietary business information. MicroStrategy did this by giving the co-conspirators unauthorized access to OpenRisk's cloud environment, on which OpenRisk's confidential intellectual property and confidential and proprietary business information was transferred and stored, and then concealing from OpenRisk that it had given the access; by secretly accepting payments from the co-conspirators and concealing those payments from OpenRisk; and by secretly working with the co-conspirators to pick up the development on the OpenRisk Platform where OpenRisk left off when its Former Employees resigned in concert to secretly join Mr. Roston and his new

company Spectant.

11.     MicroStrategy acted willfully and maliciously in furtherance of the conspiracy against OpenRisk.   MicroStrategy not only concealed from OpenRisk that it had facilitated the theft of OpenRisk's intellectual property and business information, it misled OpenRisk by demanding that OpenRisk pay fees for services under the Contract even though the co-conspirators had paid those fees and had been given unauthorized access to OpenRisk's cloud environment.   MicroStrategy then terminated the Contract for non-payment.

12.     As a result of MicroStategy's participation in the conspiracy and other unlawful acts, MicroStrategy and its co-conspirators have harmed and continue to harm OpenRisk.

## PROCEDURAL HISTORY

13.     OpenRisk first learned of MicroStrategy's role in the conspiracy through discovery in litigation that OpenRisk filed against the Former Employees in state court in Massachusetts.     OpenRisk then sued MicroStrategy in that court earlier this year. MicroStrategy moved to dismiss the case, claiming that a forum selection clause in the Contract required OpenRisk to file its claims in Virginia.

14.     While MicroStrategy's motion to dismiss was pending in the Massachusetts court, MicroStrategy filed this action, claiming breach of the Contract and that OpenRisk should pay for five years of services under the Contract, even though MicroStrategy terminated the Contract after a few months, conspired with Mr. Roston, Spectant and the Former Employees and facilitated their theft of OpenRisk's confidential intellectual property and confidential and proprietary business information, and received from its co-conspirators some of the payments that it claims it is owed from OpenRisk.

15.     On November 24, 2014, OpenRisk answered MicroStrategy's complaint in this

action.

16.     Also on November 24, 2014, OpenRisk received notice of the Massachusetts

state court's ruling on MicroStrategy's motion to dismiss, which holds that:

> Defendant MicroStrategy's Motion to Dismiss is ALLOWED, conditioned on
> MicroStrategy's undertaking, made in writing and filed with this Court on or
> before December 1, 2014, that if on or before December 24, 2014,
>
> (a) OpenRisk moves for leave to add substantially the same claims as are dismissed
>     in this action as counterclaims in the Eastern District of Virginia action [that is,
>     this action] (to which motion MicroStrategy will assent) and the motion is
>     allowed, and/or
>
> (b) OpenRisk commences an action asserting such claims in a Virginia state court of
>     competent jurisdiction,
>
> MicroStrategy will not assert a statute of limitations or laches defense in the
> Virginia action(s).
>
> If MicroStrategy does not so agree, it shall notify the Court in writing on
> or before December 1, 2014, and this case will remain in this session.

17.     On December 1, 2014, MicroStrategy filed an Undertaking in the Massachusetts

state court case providing:

> Pursuant to the Court's November 24, 2014 Order (Order) (Docket No. 21),
> Defendant MicroStrategy Services Corporation ("MicroStrategy") undertakes
> and represents that, if on or before December 24, 2014,
>
> (a) Plaintiff OpenRisk, LLC ("OpenRisk") moves for leave to add
>     substantially the same claims as have been dismissed here, pursuant to
>     the Order, as counterclaims in the Eastern District of Virginia action
>     (to which MicroStrategy will assent) and the motion is allowed,
>     and/or
>
> (b) OpenRisk commences and action asserting such claims in a Virginia
>     state court of competent jurisdiction,
>
> MicroStrategy will not assert and statute of limitations or laches defense in the
> Virginia action(s).

## THE PARTIES

18.      OpenRisk is a limited liability company formed  under the laws of the state of Delaware, with a principal place of business at 65 Clark Street,  Belmont, Middlesex County, Massachusetts.  OpenRisk is registered as a foreign limited liability company in Massachusetts. OpenRisk's members are:  five individuals residing in Massachusetts; two Massachusetts limited liability companies whose members reside in Massachusetts; a California trust whose trustee is a resident of California; a  Massachusetts limited partnership whose members reside in Massachusetts; and a Florida limited  liability company whose sole member resides in New Jersey.

19.      MicroStrategy is a corporation  formed under the laws of the state of Delaware, with a principal place of business at 1850  Towers Crescent Plaza, Tysons Corner, Virginia.

## MICROSTRATEGY'S CO-CONSPIRATORS

20.      MicroStrategy's co-conspirators include  Mr. Roston, his companies (MNR Capital,  Spectant and Arcvandam), the Former Employees, and others (collectively, the "Co-Conspirators").

21.      Mr. Roston is an individual with a last known address at  104 Scotland Road, South Orange, New Jersey  07079, who now lives in Montana.

22.      MNR Capital is a limited liability company formed under the laws of the state of New Jersey with a principal place of business at 104 Scotland Road, South Orange, New Jersey 07079.  Mr. Roston is a principal of MNR Capital.

23.      Spectant is a limited liability company  formed under the laws of the state of New Jersey, with a principal place of business at 104  Scotland Road, South Orange, New Jersey 07079.  Mr. Roston is a principal of Spectant.

24.     Arcvandam Corp. ("Arcvandam") is a corporation formed under the laws of the state of New Jersey, with a principal place of business at 104 Scotland Road, South Orange, New Jersey 07079. Mr. Roston is a principal of Arcvandam.

## OPENRISK'S VALUABLE CONFIDENTIAL INTELLECTUAL PROPERTY AND CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION

25.     OpenRisk's Platform would be the world's first private cloud-based hosting platform for catastrophe models offering to insurance and reinsurance companies – for the first time – web-based access to these catastrophe models.

26.     The principal value proposition of the OpenRisk Platform to insurance and reinsurance companies was unprecedented speed and reducing or eliminating the need to maintain their own massive hardware systems, high end modeling specialists and technological support. This could save the companies millions of dollars per year.

27.     The additional value proposition of the OpenRisk Platform to the insurance industry included: (a) data certification and portfolio chain of custody; (b) simplified access to catastrophe models via a web-based uniform user interface; (c) data analytics provided using a private grid of Asymmetric Massively Parallel Processing (AMPP™) database appliance hardware from IBM/Netezza; (d) enterprise-grade business intelligence providing custom report generation using business intelligence software from MicroStrategy; (e) a custom "App Store"-type marketplace with data and analytical software add-ons to enhance property catastrophe data and improve modeling results; and (f) a portal-based community where users can interact through a professional gateway and exchange data with authorized users.

28.     OpenRisk worked independently and together with its critical vendors and its other agents to develop and to design the components of the OpenRisk Platform – including the associated architectural designs, the software and unique source code (such as specifications, test

scripts and database formats).

29.     The architectural design of the OpenRisk Platform was designed to be realized in an interlocking package of technologies and subcontractor-partners, including (a) use of the MicroStrategy Business Intelligence or Cloud Intelligence Platform, (b) use of the "Adeptia Integration Suite" with software written by OpenRisk's vendor Adeptia, Inc., and (c) other technologies including packages named "Liferay" and "Alfresco." This and all related work product was OpenRisk's confidential intellectual property and confidential and proprietary business information.

30.     The OpenRisk confidential intellectual property and confidential and proprietary business information was implemented in part on a cloud intelligence environment supplied to OpenRisk by IBM.  On October 12, 2011, with MicroStrategy's assistance, the Co-Conspirators moved this property and information to a MicroStrategy cloud environment named "OpenRisk," and then moved the property and information again in a later version of the MicroStrategy cloud environment named "C289," which was operated by Spectant.

31.     MicroStrategy facilitated both the porting of OpenRisk's property and information from the IBM-owned system to the MicroStrategy-owned system in an OpenRisk-contracted environment, and the moving again of OpenRisk's property and information to a Spectant environment on the MicroStrategy system.  Among other things, MicroStrategy assisted engineers working on behalf of Spectant in continuing work on the OpenRisk property and information.

32.     The overarching software infrastructure for the OpenRisk Platform was provided by the MicroStrategy "Business Intelligence" or "Cloud Intelligence" platform. These two systems are essentially the same; the difference is that the Business Intelligence version is

licensed by a customer and installed on the customer's own computers, whereas the Cloud Intelligence version is licensed and installed in computers owned and maintained by MicroStrategy.

33.     OpenRisk's former employees and consultants initially developed the OpenRisk Platform on MicroStrategy's Business Intelligence platform.  Then, beginning October 11, 2011 when MicroStrategy completed configuration of a hosted environment for OpenRisk's use, development shifted to the MicroStrategy Cloud Intelligence version.  That was also the day that the three Former Employees, as part of the conspiracy against OpenRisk, resigned in concert. With MicroStrategy's assistance, the Former Employees had continued and unlawful access to OpenRisk's property and information even after their resignations from OpenRisk.

34.     The following specific pieces of OpenRisk's intellectual property were developed by it and taken from it by Spectant with the assistance of MicroStrategy and others:  (a) a configured web server within the MicroStrategy Business and/or Cloud Intelligence environment (layer 1 of the OpenRisk Platform); (b) portal code for the web server (layer 2 of the OpenRisk Platform) which included at least "Liferay" and "OpenIam" technology; (c) a configuration of Google Maps for the MicroStrategy Business Intelligence environment; and (d) a set of web customizations including features such as:   "hidePromptsIndex," "hideReportBar," hideReportDetails," and "renameRunReport."

35.     Discovery in the Massachusetts litigation shows that, as late as August 12, 2012, Spectant continued to work with source code containing explicit pathname references to, and owned by, OpenRisk with the assistance of MicroStrategy.  For example, this code was in the MicroStrategy "C289" cloud intelligence environment being operated by Spectant on August16, 2012:

"\\corp-fs1-tech\TechSupp\CLIENTS\O\**OpenRiskLLC**[ID1026734]\550593\4713056**.**"

36.     The OpenRisk confidential intellectual property and confidential and proprietary business information that was ported over  to the MicroStrategy cloud environment named "OpenRisk," which was set up by MicroStrategy by October 11, 2011, included the following:

- MicroStrategy Metadata, located on one of the machines in OpenRisk's MicroStrategy Business Intelligence environment: \\10.24.11.10\orskashplprdcifs\uploads\MSTR_MD\OpenRisk_MD.zip;

- Netezza Database Dumps, located on the same OpenRisk machine at \\10.24.11.10\orskashplprdcifs\uploads\Netezza_DB_Dumps\openrisk-db-backup-Oct-13-11.tar.gz;

- Web customizations; and

- The "MicroStrategy MD" or meta-data was custom programming work for the OpenRisk environment that was also the property of OpenRisk.

37.     Source code developed in collaboration and under contract with OpenRisk by IBM in the summer of 2011 – which enabled the running of the  hurricane model at unprecedented speed on the IBM AMPP$^{TM}$ – is the same code referenced at the item above beginning "Netezza Database Dumps…."  This valuable code owned by OpenRisk was also moved from the OpenRisk cloud environment to the Spectant "C289" cloud environment with the assistance of MicroStrategy.

36.     The foregoing paragraphs describe the OpenRisk confidential intellectual property and confidential and proprietary business information that was deployed in the MicroStrategy cloud and then moved from the OpenRisk cloud environment to the C289 cloud environment operated by Spectant, all with the assistance of MicroStrategy.

38.      In addition to the software platform, in 2011, OpenRisk also was developing two other innovative products:   the CAT RISK Index (also known as CRI), and the OpenRisk Risk Trading Exchange or  OpenRx.

39.     The CRI was conceived to enable insurance securitization via the capital markets – offering for the first time a near real-time, portfolio specific CRI.  The near real-time aspect of the CRI would be a major improvement over other insurance securitization products, such as CAT Bonds, Industry Loss Warranties and PCS Catastrophe Insurance Options.

40.     The OpenRx was conceived to enable – for the first time – trading of catastrophe risk related securities based on actual damage estimates and had the capability of being reported in near real time, the development of which requires a platform hosting multiple CAT models which has been non-existent and would have made the OpenRisk Platform the first of its kind and the first to enable trading of such near real-time products.

41.     OpenRisk at all times took the necessary and reasonable steps to protect its confidential intellectual property and confidential and proprietary business information from disclosure to competitors and others outside of the company.  For example, each of the members of the Company, including the Former Employees, became a party to the Company's Operating Agreement, which has a Confidentiality provision.

42.     In addition, each of the Former Employees was a party to a Service Agreement with OpenRisk promising that they would not use OpenRisk's property for his own benefit.  OpenRisk demanded that the Former Employees return its property when they left.

43.     OpenRisk also entered into non-disclosure agreements with vendors, investors and prospective vendors and investors.

44.     MicroStrategy knew or should have known that the Former Employees owed contractual and fiduciary obligations to OpenRisk – including obligations to maintain the confidentiality of OpenRisk's confidential and proprietary information, and obligations not to usurp or interfere with OpenRisk's business opportunities.

## OPENRISK'S CUSTOMERS, PROSPECTIVE CUSTOMERS
## AND OTHER BUSINESS OPPORTUNITIES

45.     Within its first nine months of operations, OpenRisk was well underway with the development of its software platform and was working with a number of vendors – including CIGNEX Technologies, Inc. ("CIGNEX"), Adeptia, IBM and others to fully  commercialize the Platform.

46.     OpenRisk  projected at the time that – for the Platform alone – within the first five years of operations, it would earn more than $150 million in revenues at high profit margins. This did not include projected revenues from the CRI or OpenRX.

47.     The technology and insurance industry took notice of OpenRisk's promising new products and progress towards development.

48.     In June 2011, OpenRisk's development partner IBM awarded OpenRisk a prestigious technology innovation award for the OpenRisk Platform.  As a critical part of the development of the OpenRisk Platform, IBM worked with OpenRisk in 2011 to develop a fully ported hurricane model capable of running on its AMPP$^{TM}$.  IBM referred to this work as the "crown jewel" in its portfolio.

49.     In September 2011, OpenRisk was in contract negotiations with AIG/Chartis ("AIG") – the largest insurance carrier in the world – to jointly develop a product.  Milestone payments under the contract would have totaled as much as $9 million over three years.

50.     MicroStrategy knew about OpenRisk's ongoing contract negotiations with AIG/Chartis.   OpenRisk shared with MicroStrategy the documentation that was used by OpenRisk to make a proposal for the contract with AIG.  Upon information and belief, MicroStrategy assisted and discussed with OpenRisk how to improve the contract documentation, including a Statement of Work.

51.     As a direct result of the misconduct of MicroStrategy and its Co-Conspirators in furtherance of the conspiracy, OpenRisk ultimately could not pursue the contract or other business opportunities with AIG/Chartis, and the Co-Conspirators supplanted OpenRisk in the discussions with AIG/Chartis regarding their progress developing the technology of the OpenRisk Platform which had been stolen from OpenRisk.  These discussions continued until at least December 2012 when AIG/Chartis hired one of the Former Employees upon the expiration of his non-compete.

52.     Also in September 2011, Guy Carter & Company, LLC ("Guy Carpenter") – a $1 billion global reinsurance intermediary – was pursuing an agreement with OpenRisk whereby OpenRisk would provide its Platform exclusively to Guy Carpenter among reinsurers.

53.     Also in September 2011, OpenRisk had an escrow account in place with over $400,000 of additional investment capital.

## MARC ROSTON'S FAILED ATTEMPT TO GAIN A CONTROLLING INTEREST IN OPENRISK

54.     In August 2011, Marc Roston was introduced to OpenRisk as a potential investor. After conducting  some due diligence, in September 2011, Mr. Roston and MNR Capital made a bid to acquire a controlling interest in OpenRisk for $200,000.  This was consistent with valuing OpenRisk at approximately $400,000 – or just a fraction of the $9 million approximate valuation of OpenRisk in August 2011 by another investor.

55.     As part of his  plan to effect this transaction, Mr. Roston secretly offered the Former Employees (who were then still at OpenRisk) a 10% commission as part of their compensation should he and/or MNR Capital become the controlling owner of OpenRisk.  This was a significant amount considering that, at the time, OpenRisk had more than $9 million in potential revenues from contracts then in the works.

56.     OpenRisk refused Mr. Roston's offer.

### THE CO-CONSPIRATOR'S FORMATION OF SPECTANT
### AND SCHEMING AGAINST OPENRISK

57.     OpenRisk did not realize at the time that Mr. Roston was not going to give up after the negotiations between him and OpenRisk failed to result in a transaction because he wanted OpenRisk's valuable intellectual property and promise for a lucrative business – whether he got it lawfully or not.

58.     Subsequent to the failed negotiations between OpenRisk and Mr. Roston/MNR Capital, Mr. Roston formed Spectant, intending it as a repository for OpenRisk's confidential intellectual property and confidential and proprietary business information.

59.     Mr. Roston had earlier persuaded the Former Employees to join his scheme and, at his urging, on October 11, 2011, they resigned from OpenRisk, the same day that Mr. Roston's offer to OpenRisk for a controlling interest in OpenRisk expired, thereby attempting to leverage OpenRisk's acceptance of the offer with the departure of three of its key employees.

### MICROSTRATEGY'S WILLFUL AND MALICIOUS PARTICIPATION
### IN THE CONSPIRACY AGAINST OPENRISK

60.     Meanwhile, OpenRisk had entered into the Contract with MicroStrategy for cloud services.  OpenRisk signed the Contract on September 28, 2011, and MicroStrategy signed it the next day.

61.     On October 10, 2011, the day before the Former Employees resigned from OpenRisk, one of the Former Employees – OpenRisk's President – met with MicroStrategy.

62.     Although OpenRisk did not know it at the time, immediately after the Former Employees resigned, on or about October 13, 2011, MicroStrategy began to actively work with the Co-Conspirators to unlawfully transfer OpenRisk's confidential intellectual property and confidential and proprietary business information onto the cloud provided by MicroStrategy

pursuant to the Contract, by giving them unauthorized access to OpenRisk's cloud environment which had been built by MicroStrategy in accordance with proprietary OpenRisk architectural drawings provided to MicroStrategy by OpenRisk.

63.   Although OpenRisk did not know it at the time, immediately after the Former Employees resigned, on or about October 13, 2011, MicroStrategy began to actively work with the Co-Conspirators to unlawfully transfer OpenRisk's confidential intellectual property and confidential and proprietary business information onto the cloud provided by MicroStrategy pursuant to the Contract, by giving them unauthorized access to OpenRisk's cloud environment which had been built by MicroStrategy in accordance with proprietary OpenRisk architectural drawings provided to MicroStrategy by OpenRisk.

64.   Although OpenRisk did not know it at the time, the Co-Conspirators made payments on the Contract.  On October 31, 2011, one of the Former Employees paid $15,000 to MicroStrategy, which was the amount then due from OpenRisk under the Contract.  Mr. Roston later reimbursed the Former Employee.  OpenRisk and Mr. Roston had jockeyed back and forth in the course of negotiations over whether Mr. Roston or OpenRisk should pay the $15,000 due from OpenRisk to MicroStrategy on October 31, 2011, but no agreement on that was reached and the making of the payment by the Former Employee was actively concealed from OpenRisk.

65.   MicroStrategy concealed from OpenRisk that this payment had been made. MicroStrategy also concealed from OpenRisk that MicroStrategy was giving the Co-Conspirators unauthorized access to OpenRisk's environment on the MicroStrategy cloud and the confidential intellectual property and confidential and proprietary business information on the cloud.  Indeed, MicroStrategy intentionally misled OpenRisk about the $15,000 payment – falsely advising OpenRisk on multiple occasions that the amount was outstanding, including on November 1,

2011, when MicroStrategy advised that it would allow an extra day for OpenRisk to make the payment.

66.     The pressure by MicroStrategy on OpenRisk to pay amounts that it did not owe for services that it was not receiving furthered the conspiracy because, meanwhile, Mr. Roston continued to pressure OpenRisk – which had suffered from the loss of its key employees and their know-how – to accept his low-ball offer for a controlling stake in OpenRisk.   OpenRisk still refused.

67.     On November 30, 2011, when a second payment of $15,000 was due from OpenRisk under the Contract, upon information and belief, one of the Co-Conspirators paid MicroStrategy that amount.   Again, MicroStrategy furthered the conspiracy by concealing from OpenRisk that this payment had been made.

68.     MicroStrategy's willful and malicious participation in the conspiracy continued even after it received a cease and desist letter sent by OpenRisk's counsel on December 13, 2011. In the letter, OpenRisk advised that the Former Employees had failed to return OpenRisk property, including its trade secrets, and requested that MicroStrategy "cease and refrain from doing any work and making any efforts to  commercialize the OpenRisk property with these former employees."   When a similar cease and desist letter was sent December 19, 2011 to OpenRisk's critical vendor IBM, IBM heeded OpenRisk's request not to continue working with the former employees.

69.     At the time, OpenRisk did not know that Spectant existed or that MicroStrategy was providing it and the Co-Conspirators, who included the Former Employees, unauthorized access to OpenRisk's environment on the MicroStrategy cloud containing confidential intellectual property and confidential and proprietary business information of OpenRisk.   Even after receiving

the cease and desist letter, in furtherance of the conspiracy, MicroStrategy did not cease, desist, or advise OpenRisk of the theft or conspiracy against it.

70.     Further evidencing its willfulness and malicious intent, upon information and belief, in November and December 2011, MicroStrategy considered sending a letter of reassignment to OpenRisk by which OpenRisk would consent to having its confidential intellectual property and confidential and proprietary business information on its cloud environment transferred to Spectant.  Because sending such a letter to OpenRisk would have revealed MicroStrategy's active participation in a conspiracy against OpenRisk and that MicroStrategy was demanding from OpenRisk payments on a Contract for which it was receiving no services and for which it had actually been paid, MicroStrategy never sent the letter to OpenRisk.

71.     On or about January 1, 2012, Spectant made a payment of $63,000 to MicroStrategy.  This is the amount that would have been due at the time from OpenRisk under the Contract.

72.     On or about January 3, 2012, Mr. Roston signed on behalf of Spectant a cloud contract with MicroStrategy.  The  contract between Spectant and MicroStrategy shows that the Co-Conspirators made the two $15,000 payments and the $63,000 payment.

73.     On about January 20, 2012, MicroStrategy sent a letter to OpenRisk purporting to provide 30-days notice of MicroStrategy's intent to terminate the Contract for OpenRisk's failure to pay $63,000.  In so doing, MicroStrategy further concealed its participation in the conspiracy and willfully and maliciously furthered it.  MicroStategy did not say in the letter that the $63,000 had in fact already been paid by Spectant or that MicroStrategy had facilitated the Co-Conspirators' theft of OpenRisk's confidential intellectual property and confidential and

proprietary business information by granting the Co-Conspirators unauthorized access OpenRisk's cloud environment.

74.     Even now, MicroStrategy seeks to conceal its participation in the conspiracy and to further it. The breach of contract claim that it has asserted against OpenRisk in this action is for payments under the Contract that were in fact at least in part made by Spectant and the Co-Conspirators through the fall of 2012. The claim is also based on the false premise that MicroStrategy provided services under the Contract to OpenRisk rather than facilitating the theft of its confidential intellectual property and confidential and proprietary business information and subsequently providing services to Spectant.

75.     OpenRisk has been damaged by MicroStrategy's participation in the conspiracy and other unlawful acts. The theft of OpenRisk's confidential intellectual property and confidential and proprietary business information would not have been possible without MicroStrategy's facilitation because the Co-Conspirators needed the MicroStrategy cloud space that MicroStrategy had set up in accordance with proprietary OpenRisk architectural drawings in order to transfer OpenRisk's confidential intellectual property and confidential and proprietary business information. With the theft, OpenRisk's efforts to develop and market its products ground to a halt and its business prospects evaporated. Instead of reaping the benefits of the prospective contracts that it had lined up before the conspiracy, OpenRisk has been mired in expensive litigation to take back what was unlawfully taken from it.

## CAUSES OF ACTION

## COUNTERCLAIM I
## AIDING AND ABETTING BREACH OF CONTRACTUAL AND FIDUCIARY DUTIES

76.     MicroStrategy realleges and incorporates by reference paragraph 1 through 75.

77.     MicroStrategy knew or should have known of the Co-Conspirators' contractual

and fiduciary duties to OpenRisk.

78.     MicroStrategy aided and abetted the Co-Conspirators' breach of their contractual and fiduciary duties.

79.     As a direct and proximate result of MicroStrategy's aiding and abetting breach of contractual and fiduciary duties, OpenRisk has suffered and will continue to suffer harm to its competitive position, its relationships with customers and prospective customers, its relationships with vendors and prospective vendors, its economic expectancies, its business reputation and its goodwill.

80.     As a direct and proximate result of MicroStrategy's aiding and abetting breach of contractual and fiduciary duties, OpenRisk has suffered damages exceeding $10 million.

## COUNTERCLAIM II
## BUSINESS CONSPIRACY IN VIOLATION OF
## VIRGINIA CODE §§ 18.2-499 – 18.2-500

81.     MicroStrategy realleges and incorporates by reference paragraph 1 through 80.

82.     MicroStrategy combined with the Co-Conspirators for the purpose of willfully and maliciously injuring OpenRisk in reputation, trade, business or profession – by, among other things, facilitating the Co-Conspirators' theft of OpenRisk's confidential intellectual property and confidential and proprietary business information through granting unauthorized access to OpenRisk's cloud environment which had been set up by MicroStrategy pursuant to proprietary OpenRisk architectural drawings, and by deliberately and repeatedly concealing the theft through, among other things, demanding payment from OpenRisk for services that it was not receiving, services which were secretly being rendered by MicroStrategy to Spectant, and for which the Co-Conspirators in fact paid.

83.     As a direct and proximate result of MicroStrategy's participation in the conspiracy,

OpenRisk has suffered damages exceeding $10 million.

**COUNTERCLAIM III**
**COMMON LAW CONSPIRACY**

84.     MicroStrategy realleges and incorporates by reference paragraph 1 through 83.

85.     MicroStrategy combined with the Co-Conspirators to accomplish, by some concerted action, some criminal or unlawful purpose by criminal or unlawful means – by, among other things, facilitating the Co-Conspirators' theft of OpenRisk's confidential intellectual property and confidential and proprietary business information through granting unauthorized access to the OpenRisk cloud environment for the transfer by the Co-Conspirators of OpenRisk's confidential intellectual property and confidential and proprietary business information, which would not have been possible without the existence of the OpenRisk environment as set up by MicroStrategy on its cloud in accordance with proprietary OpenRisk architectural drawings provided to MicroStrategy by OpenRisk., and by deliberately and repeatedly concealing the theft through, among other things, demanding payment from OpenRisk for services that it was not receiving and for which the Co-Conspirators in fact paid.

86.     As a direct and proximate result of MicroStrategy's acts committed in furtherance of the conspiracy, OpenRisk has suffered damages exceeding $10 million dollars.

**PRAYER FOR RELIEF**

WHEREFORE, OpenRisk requests that this Court:

1)   Enter judgment awarding three-fold the damages to OpenRisk in an amount to be proven at trial, plus reasonable attorney's fees and costs and all other and further relief as may be just and appropriate under the circumstances;

2)   Grant such injunctive and other relief as the Court may deem just and proper.

## JURY DEMAND

OpenRisk hereby demands trial of these counterclaims by jury.

Dated:          December 30, 2014          Respectfully submitted,


/s/  Ellen D. Marcus
Ellen D. Marcus (VA Bar No. 44314)
Kathleen J.L. Holmes (VA Bar No. 35219)
HOLMES COSTIN & MARCUS PLLC
5203 Lyngate Court, Suite B
Burke, Virginia  22015
Telephone:  (703) 260-6401
Fax:  (703) 439-1873
emarcus@hcmlawva.com
kholmes@hcmlawva.com

Of Counsel:

Francis G. Gleason *(*admitted *pro hac vice)*
GLEASON & GLEASON
245 Winter Street
Ashland, Massachusetts  01721
Telephone: (508) 881-2955
Fax:  (508) 881-4904


*Attorneys for OpenRisk, LLC*

## Certificate of Service

I hereby certify that on December 30, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Donald Burke
> Kathryn S. Zecca
> ROBBINS, RUSSELL, ENGLEBERT, ORSECK, UNTEREINER & SAUBER LLC
> 1801 K Street, N.W.
> Washington, D.C.  20006
> dburke@robbinsrussell.com
> kzecca@robbinsrussell.com

/s/ _____
Ellen D. Marcus (VA Bar No. 44314)
Kathleen J.L. Holmes (VA Bar No. 35219)
HOLMES COSTIN & MARCUS PLLC
5203 Lyngate Court, Suite B
Burke, Virginia  22015
Telephone:  (703) 260-6401
Fax:  (703) 439-1873
emarcus@hcmlawva.com
kholmes@hcmlawva.com

*Attorneys for OpenRisk, LLC*
