IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| MICROSTRATEGY SERVICES CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14cv1244 (JCC/IDD) |
| | ) | |
| OPENRISK, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on MicroStrategy
Services Corp.'s ("MicroStrategy") Motion for Partial Summary
Judgment [Dkt. 129] and OpenRisk LLC's ("OpenRisk") Motion to
Dismiss for Lack of Jurisdiction or in the Alternative for
Judgment on the Pleadings or Summary Judgment [Dkt. 132].  For
the following reasons, the Court denied OpenRisk's motion to
dismiss for lack of jurisdiction from the bench.  The Court
denied both parties' motions for summary judgment.  This
Memorandum Opinion memorializes the Court's reasoning.

**I. Background**

The following facts are not disputed.  MicroStrategy
and OpenRisk entered into a contract in September 2011 wherein
MicroStrategy was to provide cloud service technologies to
OpenRisk.  (OpenRisk's Mem. in Supp. of Mot. to Dismiss [Dkt.

1

133] at 4.)  The terms of the contract were in the master subscription agreement ("subscription agreement") and corresponding order form ("order form").  (*Id.*)  The subscription agreement states that "[a]ll payment obligations are non-cancelable [.]"  (MicroStrategy's Mem. in Supp. of Summ. J. [Dkt. 130], Donald Burke Aff., Ex. 1, at 6.)  Should OpenRisk or MicroStrategy terminate the agreement, OpenRisk "will be obligated to pay the balance due on [its] account computed in accordance with the Charges and Payment of Fees section above." (*Id.* at 7.)  That section required OpenRisk to pay all fees or charges in accordance with the terms set forth in the order form.  (*Id.* at 6.)

As stated on the order form, OpenRisk's monthly recurring fee was $21,000, which was billed quarterly.  (Burke Aff., Ex. 2, at 14.[1])  The initial invoice was for $93,000. (*Id.*)  It was broken into smaller payments as follows: (1) a $15,000 set up fee due on October 31, 2011; (2) an additional $15,000 set up fee due on November 30, 2011; and (3) the first quarterly payment of $63,000 due on January 1, 2012.  (*Id.*)  The second invoice, which was to be issued on or about December 30, 2011, was due on March 1, 2012; all other invoices were due in full thirty days after the date of the invoice.  (*Id.*)  The

---

[1] The exhibits to Donald Burke's affidavit are continuously paginated.  The Court maintains the pagination found on CM/ECF.

order form had a term of sixty months. (*Id.* at 13.)  Shajy
Mathai ("Mathai"), an OpenRisk employee, was listed as the
subscription coordinator, though at some point in early October,
he resigned from OpenRisk. (OpenRisk's Mem. in Supp. at 5, 13.)[2]
The order form was signed by OpenRisk on September 28 and by
MicroStrategy on September 29, 2011. (*Id.* at 15.)

Jordan Christopher ("Christopher"), the MicroStrategy
account executive on the OpenRisk account, repeatedly advised
OpenRisk in advance of its first payment due date of October 31
that missing a payment would jeopardize the relationship between
the two companies. (OpenRisk's Mem. in Supp. at 5.)  On October
31, Mathai, who had already resigned from OpenRisk, made a
$15,000 payment to MicroStrategy, the amount due under the terms
of the subscription agreement and order form. (*Id.* at 6.)
This $15,000 payment from Mathai was labeled "FBO OPEN RISK LLC"
and was applied to OpenRisk's invoice for the $15,000 payment
due that day. (*Id.*)

Christopher did not inform OpenRisk of Mathai's
payment. (*Id.*)  Rather, after receiving the payment from
Mathai, Christopher contacted James Aylward ("Aylward"),
OpenRisk's CEO, on November 1 stating that MicroStrategy
expected to receive the $15,000 payment that day. (*Id.*)

---

[2] MicroStrategy states Mathai resigned on October 11, while
OpenRisk claims it was October 10.  Determining which date he
resigned is not material to the outcome of the matters here.

Aylward replied, stating that a deal for a potential buyer for OpenRisk had fallen through. (Def. App. [Dkt. 135] at 71.) He then stated: "All that said, obviously we can no longer raise funds or continue as a going concern. We have no cash and no way to fund operations, and will be shutting down over the next few weeks. Please give me a call over the next few days and we can discuss." (*Id.*) On November 9, Aylward sent another email to Christopher. Aylward wrote: "Our Board of Directors this week has determined that we cannot continue as a going concern and will be closing company operations effective immediately. Please discontinue all services to OpenRisk, LLC." (*Id.* at 73.)

Meanwhile, two other high-ranking OpenRisk employees, in addition to Mathai, left the company, joining forces with Marc Roston ("Roston") to form Spectant Group, LLC ("Spectant"). OpenRisk had another payment deadline looming on November 30, 2011. (OpenRisk's Mem. in Supp. at 7.) Spectant paid MicroStrategy $15,000 on November 29, 2011.[3] (*Id.*)

January 1, 2012 came and went without a payment from OpenRisk as required under the terms of the order form. (OpenRisk's Mem. in Supp. at 9.) MicroStrategy sent OpenRisk a termination letter on January 20, 2012 pursuant to section eight

---

[3] The implication of this statement is that Spectant paid the $15,000 on OpenRisk's behalf. MicroStrategy is not seeking damages in this litigation for either the October or November payments. (MicroStrategy's Opp'n [Dkt. 155] at 8, 11; *see also* Compl. ¶ 30.)

of the subscription agreement.  (Def. App. at 60.)
MicroStrategy provided a thirty-day cure period.  (*Id.*)  If
payment was not received by the end of that period, the
subscription agreement, the order form, and all of
MicroStrategy's obligations thereunder would terminate.  (*Id.*)
OpenRisk did not provide payment within the thirty-day period,
and as such MicroStrategy terminated OpenRisk's cloud services
contract for non-payment.  (OpenRisk's Mem. in Supp. at 9.)

MicroStrategy filed this action in September of 2014
alleging one count of breach of contract.  (Complaint [Dkt. 1].)
Soon thereafter, OpenRisk moved to dismiss the action for lack
of subject matter jurisdiction, arguing the amount in
controversy requirement was not satisfied.  (OpenRisk's Mot. to
Dismiss [Dkt. 10] & Mem. in Supp. [Dkt. 11].)  The Court denied
the motion.  (11/19/14 Hr'g Tr. [Dkt. 19] at 4.)[4]  After the
close of discovery, the parties filed the instant motions.
Having been fully briefed and argued, these motions are ripe for
disposition.

## II. Analysis

### A. Subject Matter Jurisdiction

Federal courts are "courts of limited jurisdiction . .
. possess[ing] only that power authorized by Constitution and

---

[4] This case was assigned to the undersigned after the hearing on
the motion to dismiss.  (*See* 1/9/15 Order [Dkt. 31].)

statute." *Exxon Mobil Corp. v. Allpattah Servs., Inc.*, 545 U.S. 546, 552 (2006) (citation and internal quotation marks omitted). Congress has conferred on the district courts original jurisdiction in federal question cases – civil actions that arise under the Constitution, laws, or treaties of the United States – and diversity cases. *Id.; see* 28 U.S.C. §§ 1331, 1332. Diversity cases are civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens. *Id.* (citing 28 U.S.C. § 1332). "To ensure that diversity jurisdiction does not flood the federal courts with minor disputes, § 1332(a) requires that the matter in controversy in a diversity case exceed a specified amount, currently $75,000." *Id.*

Subject matter jurisdiction may be challenged at any time during the proceeding. The Court may raise the issue *sua sponte* or a litigant may move under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction. Under such a motion, subject matter jurisdiction may be challenged on the face of the pleadings or based on the evidence. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). OpenRisk has already challenged this Court's subject matter jurisdiction based on the pleadings, which was denied. (*See* 11/19/14 Hr'g Tr. at 4.) Therefore, the Court focuses its attention on the second method.

In such a challenge, the litigant, here OpenRisk, argues that the jurisdictional allegations of the complaint are not true. *Adams*, 697 F.2d at 1219. "A trial court may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." *Id.* The court then weighs the evidence to determine whether it has jurisdiction. *Id.* "This does not usually present a serious problem except in those cases where the jurisdictional facts are intertwined with the facts central to the merits of the dispute. It is the better view that in such cases the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Id.* (citations and internal quotation marks omitted).

"The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction." *Id.; see also* 14A Charles Wright & Arthur Miller, *et al.*, <u>Federal Practice and Procedure: Jurisdiction</u> § 3702.2 (4th ed.); *Zimmer-Hatfield, Inc. v. Wolf*, 843 F. Supp. 1089, 1091 (S.D. W. Va. 1994) ("[S]tated affirmatively, the plaintiff generally is required to show that it is probable that she would recover at least the jurisdictional amount.") (citation and internal quotation marks omitted).

The guiding principle in determining whether the amount in controversy requirement is satisfied is referred to as

7

the "legal certainty" test and was stated in *St. Paul Mercury Indemnity Co. v. Red Cab Co.*:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

303 U.S. 283, 289 (1938). The inability of a plaintiff to recover the amount pled is not sufficient to show bad faith or to fail to meet the amount in controversy. *Id.; see also* 28 U.S.C. 1332(b) (granting the district court discretion to deny costs to plaintiff and impose costs on the plaintiff where the amount recovered falls short of $75,000); *Rosado v. Wyman*, 397 U.S. 397, 405 n.6 (1970) (stating that it is "well-settled" that a federal court does not lose jurisdiction over a diversity action which was well founded at the outset even though the amount recovered falls short of the amount in controversy). As the Supreme Court articulated the legal certainty test:

> But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

303 U.S. at 289.  The legal certainty test "appears equivalent to a conclusion that as a matter of law, the jurisdictional amount cannot be recovered, or, stated differently, no reasonable jury could award that amount."  14A Charles Wright & Arthur Miller, *et al.*, Federal Practice and Procedure: Jurisdiction § 3702 (4th ed.).

OpenRisk argues that MicroStrategy's complaint should be dismissed because the evidence shows that it is apparent, to a legal certainty, that MicroStrategy was never entitled to recover more than $75,000.  (OpenRisk's Mem. in Supp. at 11.) It makes two arguments in support.  First, OpenRisk contends the subscription agreement contains a limitation of liability provision which applies here and limits OpenRisk's liability to the amounts actually paid and/or due in the twelve-month period immediately preceding breach.  (*Id.* at 15.)  Second, OpenRisk argues that it owes MicroStrategy nothing, since Spectant paid the $63,000 due on its account to MicroStrategy in January of 2012.  (*Id.* at 13.)

MicroStrategy makes several arguments in opposition. First, MicroStrategy argues the limitation of liability clause does not limit its recovery.  Assuming it did, MicroStrategy argues that the Court would not be required to dismiss for lack of jurisdiction but rather would have discretion to dismiss the case.  (MicroStrategy's Opp'n [Dkt. 155] at 20-24.)  Second,

MicroStrategy claims that OpenRisk is not entitled to any offset of damages based on Spectant's payments to MicroStrategy. (*Id.* at 18-20.)  Finally, MicroStrategy argues that it is entitled to the full $1.26 million in payments under the non-cancelable language of the contract. (*Id.* at 16-18.)

The Court turns first to the limitation of liability clause.  The parties argue whether the Court can consider the limitation of liability clause in determining whether the amount in controversy has been satisfied.  Courts are split on this, with the Second Circuit saying such clauses cannot be considered in resolving a 12(b)(1) motion, since limitation of liability clauses are affirmative defenses that are beyond the scope of a plaintiff's complaint. *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982).  The Seventh Circuit disagrees, saying that where there is a cap on liability that is lower than the jurisdictional amount, the case must be dismissed for want of jurisdiction. *Pratt Central Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 354 (7th Cir. 1995).  There is no controlling authority from the Fourth Circuit, but sister district courts have split on the issue. *Compare Zimmer-Hatfield, Inc. v. Wolf*, 843 F. Supp. 1089, 1091 (S.D. W. Va. 1994) (citing *Zacharia* for proposition that jurisdictional amount should be determined based on plaintiff's allegations, not merits of the case), *with Rassa v. Rollins Protective Servs.*

10

*Co.*, 30 F. Supp. 2d 538, 545 (D. Md. 1998) (citing *Pratt Central* and dismissing case since liability cap was for less than the jurisdictional amount).  Without any guidance from the Fourth Circuit, the Court declines to rule on this argument.

Turning next to MicroStrategy's contention that its expectancy interest under this contract is $1.26 million, Section 8 of the subscription agreement is titled "termination for cause."  "Any breach of your payment obligations . . . will be deemed a material breach of this Agreement.  MicroStrategy, in its sole discretion, may terminate your password, account or use of the Online Service if you have materially breached this Agreement, including but not limited to failure to pay outstanding fees, and such breach has not been cured within 30 days of notice of such breach."  (Def. App. at 22.)  Under Section 6 of the subscription agreement, "Non-Payment and Suspension," MicroStrategy reserves the right to suspend or terminate the agreement for non-payment.  "If you or MicroStrategy initiates termination of this Agreement, you  will be obligated to pay the *balance due on your account* in accordance with the Charges and Payment of Fees section above." (*Id.* (emphasis added).)  The payment and fees section, Section 4, states that fees and charges are due as provided in the order form.  (*Id.* at 21.)  "Except as provided in paragraph 10 herein, all payment obligations are *non-cancelable* and all amounts paid

11

are not refundable." (*Id.* to 21-22 (emphasis added).)

MicroStrategy reads Section 4's "non-cancelable" language to

include every single payment obligation under the five-year

contract, resulting in damages of $1.26 million.  OpenRisk reads

Section 6 "balance due" as controlling, resulting in damages of

$63,000.

OpenRisk missed its January 1, 2012 payment.  On

January 11, 2012, MicroStrategy deleted OpenRisk's cloud

environment.  On January 20, 2012, MicroStrategy sent OpenRisk a

cure letter.  The letter stated:

> Pursuant to Section 8 of the
> [Subscription Agreement], MicroStrategy
> hereby notifies OpenRisk, LLC that it is in
> material breach of its payment obligations.
> Under the terms of the [Order Form], Section
> 2 of the Additional Terms, OpenRisk LLC was
> contractually obligated to pay $63,000 on or
> before January 1, 2012.  At this time,
> MicroStrategy has not received the required
> payment.
> In the event payment is not
> received on or before February 20, 2012, the
> [Subscription Agreement] and the [Order
> Form] and all of MicroStrategy's obligations
> under both agreements shall automatically
> terminate.

(Def. App. at 60.)  OpenRisk missed the cure deadline, failing

to pay $63,000 by February 20, 2012.  (OpenRisk's Reply [Dkt.

161] at 3.)  The contract terminated.  This meant that

MicroStrategy no longer had an obligation to provide cloud

computing services.  This also released OpenRisk from any future

contract obligations to pay, as the agreement was no longer in effect.  As of February 20, 2012, when the contract was terminated, the balance due on OpenRisk's account was $63,000.

MicroStrategy can sue for its expectancy interest. The Restatement (Second) of Contracts defines the expectancy interest as "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less any cost or other loss that he has avoided by not having to perform."  Restatement (Second) of Contracts § 347.  As the comments explain, "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."  *Id.*, cmt. a.  Contrary to MicroStrategy's assertion, $1.26 million is not the expectancy interest in this case.  That figure represents the total amount of payments due under the contract.  It does not account for the costs MicroStrategy would have incurred had it had to continue performing under the contract.

MicroStrategy acknowledges that the $1.26 million is subject to offset of its costs.  It claims these costs are miniscule.  First, MicroStrategy saved $7,560 in a commission it

would have had to pay Christopher, based on his compensation
agreement to receive four percent of the cash receipts paid by
OpenRisk on the contract. (MicroStrategy's Opp'n at 17.)
Second, it states that though it incurred substantial costs to
develop and launch its cloud computing business, those costs
were devoted to shared infrastructure rather than customer-
specific costs. (*Id.*) MicroStrategy had substantial unused
capacity, in terms of both technical manpower and resources,
which was shared among all customers. (*Id.*) In support of
these statements, it attaches the affidavit of Jorge Jimenez
("Jimenez"), MicroStrategy's Director of Business Intelligence
and Enterprise Data Warehousing. (MicroStrategy's Opp'n, Ex.
B.) Jimenez's affidavit states that "MicroStrategy incurred
costs for equipment and personnel to provide its cloud business
offering as a whole, and there was no need to procure additional
equipment or hire additional personnel when taking on a new
cloud customer." (MicroStrategy's Opp'n, Ex. B, ¶ 5.)
Jimenez's affidavit recognizes that there were costs to
providing cloud computing services to OpenRisk, but provides no
evidence as to OpenRisk's pro rata share of those costs. The
only information before the Court right now as to
MicroStrategy's expectancy interest are Jimenez's affidavit and
the argument of MicroStrategy's counsel that costs were
"miniscule." This is not sufficient to appropriately calculate

14

MicroStrategy's expectancy interest.  Put another way, the Court has no way to determine what dollar figure would put MicroStrategy in the position it would have been had OpenRisk performed on the contract.  All the Court can say is that $1.26 million (or rather, $1,252,440 after subtracting the anticipated commission), which is the only dollar figure MicroStrategy touts, is *not* the position MicroStrategy would have been in had OpenRisk performed.  Saying that MicroStrategy's expectancy interest is $1,252,400 is tantamount to saying that there were *no* costs associated with maintaining OpenRisk's account, which could not possibly be true.  Sharing costs among many customers, thereby driving down the per customer cost, does not mean that maintaining cloud services to OpenRisk was cost-free.

MicroStrategy has steadfastly argued that it is entitled to the full amount of payments due under the contract because of Section 4's non-cancelable language.  This is an untenable position, though the Court declines to go so far as to say that it defeats the presumption of good faith in making the jurisdictional allegations.  "Where a contract admits of two constructions, the general rule is that the court ought to adopt that which is most equitable, and which will not give an unconscionable advantage to one party over the other."  *Allemong v. Augusta Nat'l Bank*, 48 S.E. 897, 898-899 (Va. 1904).  Allowing MicroStrategy to recover five years of payments for

15

three months of service would be contrary to contract law's purpose to compensate rather than punish.  *See* Restatement (Second) of Contracts § 356, cmt. a ("However, the parties to a contract are not free to provide a penalty for its breach.  The central objective behind the system of contract remedies is compensatory, not punitive.").  Reading the contract in the way MicroStrategy urges amounts to a liquidated damages clause that is unenforceable on public policy grounds.  *See Brooks v. Bankson*, 445 S.E.2d 473, 479 (Va. 1994) ("An agreement between the parties to a contract, fixing the amount to be paid for loss which may result from breach of the contract, will be construed as a penalty when the damage resulting from a breach of contract is susceptible of definite measurement, or where the stipulated amount would be grossly in excess of actual damages.").

Though the Court agrees with OpenRisk that the measure of damages is *not* $1.26 million (or even $1,252,440), it cannot be said that it is beyond a legal certainty that MicroStrategy can never recover more than $75,000 in this case.  Put differently, a reasonable jury could award MicroStrategy damages in an amount exceeding $75,000.  MicroStrategy may indeed have had miniscule costs in managing the OpenRisk account, such that its damages are closer to the million dollar mark.  Or it may have massive (albeit shared) costs in operating its cloud computing service, such that damages are closer to the $75,000

16

threshold.  What it ultimately may recover is not relevant to the analysis at this moment.  The burden is on the plaintiff to show that it is beyond a legal certainty that it can never recover $75,000, and the Court finds on these facts that burden has not been met.  Stated differently, it is possible that MicroStrategy is entitled to recover more than $75,000.

OpenRisk does not believe MicroStrategy made the $1.26 million allegation in good faith.  This is based on several theories: that MicroStrategy breached the contract first; that Spectant, with MicroStrategy's knowledge and consent, was actually making payments on OpenRisk's behalf; and that the doctrine of anticipatory breach does not apply to this case.  These arguments wade too far into the merits of the underlying dispute for the Court to be comfortable addressing them on a jurisdictional motion.  It is possible that ultimately, one of those theories (which are perhaps better categorized as OpenRisk's affirmative defenses) will prevail and MicroStrategy's damages in this case will be less than $75,000, potentially even zero.  Should MicroStrategy ultimately recover less than $75,000, the Court will address whether an award of costs under 28 U.S.C. 1331(b) is appropriate.  But such a judgment will not divest this Court of jurisdiction.

Finally, OpenRisk argues that MicroStrategy's measure of damages is zero.  OpenRisk states that on or about January 1,

17

2012, Spectant paid MicroStrategy $63,000, "the amount due from OpenRisk on that date under OpenRisk's cloud services contract with MicroStrategy." (OpenRisk's Mem. in Supp. at 8.) Roston, on behalf of Spectant, then signed a cloud services contract with MicroStrategy on January 3, 2012. (*Id.*) In support of its contention, OpenRisk cites to MicroStrategy's answer to OpenRisk's counterclaims. (*Id.*) MicroStrategy's answer states that Spectant had a separate contractual relationship with MicroStrategy and that Spectant also had a $63,000 payment due on January 1, 2012. (Answer [Dkt. 82] ¶¶ 79, 80.)

MicroStrategy disputes that Spectant's payment was applied to OpenRisk's account. In support, it attaches the subscription agreement and order form signed by Roston on January 3, 2012 and by an OpenRisk representative on January 9, 2012. (Burke Aff., Ex. 9, at 64.) Per the terms of the order form, the effective date of the contract was December 29, 2011, with a fifty-seven month term. (*Id.* at 65.) MicroStrategy also attaches an email exchange between Roston, Christopher, and other MicroStrategy employees discussing the wire transfer of the $63,000, which per the terms of the order form was due on January 6, 2012. (*Id.* at 67, 70-72.) On the record before it, the Court cannot say conclusively that MicroStrategy's damages are zero because it appears that Spectant and MicroStrategy had an independent contractual relationship, such that Spectant's

18

$63,000 payment would in no way impact OpenRisk's payment obligation.  Thus, it is not a legal certainty that the claim is worth nothing.  Therefore, this argument must also fail.

### B. Summary Judgment

In the alternative, OpenRisk moves for summary judgment.[5]  (OpenRisk Mem. in Supp. at 16.)  OpenRisk argues that MicroStrategy's claim fails as a matter of law because it cannot prove its damages.  (*Id.*)  MicroStrategy moves for partial summary judgment on the issue of whether OpenRisk had a contractual duty to perform and whether it breached that duty. (MicroStrategy Mem. in Supp. of Summ. J. [Dkt. 130] at 6-7.)  In MicroStrategy's view, the only issue left for a trial by jury is the amount of its damages.  (*Id.* at 7-8.)

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party always bears the initial burden of "informing the district court

---

[5] OpenRisk has also moved in the alternative for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (OpenRisk Mem. in Supp. at 16.)  Because the Court wishes to consider the full record before it and not just merely the parties' pleadings, the Court will treat OpenRisk's alternative motion as one for summary judgment only.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under . . . Rule 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial."). Importantly, the non-moving party must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.  Where there is conflicting evidence, the court must credit the evidence of both sides and acknowledge that there is a genuine issue of material fact that cannot be resolved by summary judgment.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868-69 (2014) (stating that summary judgment is inappropriate where each side has put forward competent evidence that raises a dispute about a material fact).

In Virginia, the elements of a breach of contract are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of that obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).  Neither party disputes that there was a contract between the parties here.  Thus, the Court must determine whether there was a breach, and if so, whether damages can be proven.

MicroStrategy argues that Aylward's November e-mails constitute a repudiation of the contract, and thus MicroStrategy can sue OpenRisk for the entire balance of the payments due under the doctrine of anticipatory breach.  (MicroStrategy Mem. in Supp. at 7.)  "[W]hen one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other

21

party may elect to sue on it without waiting for the time of performance to arrive." *Bd. of Supervisors of Fairfax Cnty. v. Ecology One, Inc.*, 245 S.E.2d 425, 428 (Va. 1978) (citation and internal quotation marks omitted); *see also Lenders Fin. Corp. v. Talton*, 455 S.E.2d 232, 236 (Va. 1995).  The Virginia Supreme Court has held that "[i]t is firmly established that for a repudiation of a contract to constitute a breach, the repudiation must be clear, absolute, unequivocal, and must cover the entire performance of the contract." *Bennett v. Sage Payment Solutions, Inc.*, 710 S.E.2d 736, 742 (Va. 2011); *see also* Restatement (Second) of Contracts § 250 (stating repudiation entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due).

Aylward's November e-mails alerted MicroStrategy that OpenRisk would not be able to make the October 2011 payment and could not make any payments going forward.  However, up until January 1, 2012, neither party disputes that OpenRisk's account was paid in full.[6]  But neither party has addressed what, if any,

---

[6] In opposition to OpenRisk's motion to dismiss, MicroStrategy states that it "does not dispute that a second payment of $15,000 was due from OpenRisk on November 30, 2011 and that Spectant made a payment of $15,000 on November 29, 2011." (MicroStrategy's Opp'n at 11.)  MicroStrategy says this fact is "not material" because "MicroStrategy has not sought damages in connection with this $15,000 payment owed by OpenRisk and because they do not bear on the amount of OpenRisk's liability

effect these facts have on MicroStrategy's argument that
Aylward's statements constitute a repudiation of the contract.
On one view, the continued payments by third parties nullify
OpenRisk's repudiation.  A repudiation is nullified "if, to the
knowledge of the injured party, those events have ceased to
exist before he materially changes his position in reliance on
the repudiation or indicates to the other party that he
considers the repudiation to be final."  Restatement (Second) of
Contracts § 256.  There is no evidence currently before the
Court that MicroStrategy changed its position in reliance on the
repudiation or indicated to OpenRisk that it considered the
repudiation to be final.  Thus, it would appear that OpenRisk's
repudiation was nullified.  The only wrinkle to this conclusion
is that neither party disputes that OpenRisk itself did not make
the two $15,000 payments due in October and November 2011.
Accordingly, there was no change in OpenRisk's position that it
had no intention of performing under the contract.

        In light of these competing facts, the Court finds
that there are genuine issues of material fact as to whether
OpenRisk breached the contract.  Accordingly, MicroStrategy's
motion for summary judgment will be denied.

---

for damages under the parties' contract."  (*Id.*)  The Court
interprets this statement as impliedly stating that OpenRisk did
not miss a payment obligation until January 1, 2012, since it
does not seek damages for any of OpenRisk's 2011 payment
obligations.

**IV. Conclusion**

For the foregoing reasons, the Court denied OpenRisk's motion to dismiss or in the alternative for summary judgment. The Court also denied MicroStrategy's motion for summary judgment.  An appropriate order will issue.


_____
                              /s/
June 17, 2015                 James C. Cacheris
Alexandria, Virginia     UNITED STATES DISTRICT COURT JUDGE

24